<u>**NOT FOR PUBLICATION**</u>

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:

OMNE STAFFING, INC.,
d.b.a. STAFFING SERVICES                        Chapter 7
GROUP, INC., ET. AL.,                           Case No.  04-22316 (RTL)


              Debtors.
- - - - - - - - - - - - - - - - - - - - - - - - - -X
CHARLES M. FORMAN, Chapter 7
Trustee,                                        Adversary Proceeding
                                                Case No. 05-1016 (RTL)

              Plaintiff,
         v.

RUSSELL B. REAVES, <u>et. al.</u>,

              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - -X

**OPINION**

**APPEARANCES:**

FORMAN HOLT ELIADES & RAVIN, LLC.
William L. Waldman, Esq.
(Attorneys for Plaintiff)

ROTHBARD, ROTHBARD, KOHN & KELLAR
Jonathan Kohn, Esq.
(Attorneys for Defendants)

<u>**RAYMOND T. LYONS, U.S.B.J.**</u>

**INTRODUCTION**

      The Trustee sued to recover money paid by a customer to the Defendant as a

representative of the Debtor.  Defendant asserts that the Debtor owed it more money for services

1

rendered than the amount paid by the customer to the Defendant.  Therefore, argues Defendant,

there is no net amount due from Defendant to the Debtor.  The Trustee counters that the

Defendant may not setoff its claim against the Debtor because it received funds from the

customer in a fiduciary capacity.

    After considering the stipulated record, the court concludes that the Defendant did not

receive funds from the customer in a fiduciary capacity and may setoff the amount owed by the

Debtor to the Defendant against the amount owed by the Defendant to the Debtor on account of

moneys paid by the customer.  Even if the funds were received in a fiduciary capacity,

Defendant may recoup the commissions owed by the Debtor against the customer's funds due to

the Debtor.  After setoff or recoupment, there is no net amount due from Defendant to the

Debtor.  Judgment will be entered finding no cause of action against the Defendant.

## JURISDICTION

    This court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b), 28

U.S.C. § 157(a), and the Standing Order of Reference by the United States District Court for the

District of New Jersey dated July 23, 1984, referring all proceedings related to a case under title

11 of the United States Code to the bankruptcy court.

    The court must determine if this is a core or non-core proceeding.  28 U.S.C. § 157(b)(3)

(2000).  A core proceeding must be "arising under" or "arising in" title 11. *See id.* § 157(b)(1).

To be "arising under" or "arising in" title 11, a proceeding must substantively invoke title 11 or

have no existence independent of the bankruptcy case.  *See Stoe v. Flaherty*, 436 F.3d 209, 216

(3d Cir. 2006).  Section 157(b)(2) sets forth a non-exhaustive list of core proceedings.  28 U.S.C.

§ 157(b)(2) (2000).  Proceedings only "related to" a case under title 11 cannot be classified as

core.  *Id.* at 217.  "A proceeding is "related to" a bankruptcy case if 'the outcome of that

proceeding could conceivably have an effect on the estate being administered in bankruptcy.' "

*Id.* (quoting *Pacor Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984), *overturned on other*

*grounds* by *Things Remembered, Inc. v. Petrarca*, 516 U.S. 124 (1995)).

Here, the Trustee argues this case is a core proceeding under 28 U.S.C. § 157(b)(2)(A),

(O), and (E).  Section 157(b)(2)(E) classifies "orders to turn over property of the estate" as core

proceedings.  28 U.S.C. § 157(b)(2)(E).  Subsection (b) of 11 U.S.C. § 542(b) (styled "Turnover

of property of the estate") provides that "an entity that owes a debt . . . payable on demand . . .

shall pay such debts to . . . the trustee."  11 U.S.C. § 542 (Supp. 2005).  The Trustee asserts that

his suit to collect money owed by AES to Omne is a turnover proceeding and thus core.  The

Trustee's attempt to style this case as a turnover proceeding mischaracterizes the issue at hand.

Actions to turn over property of the estate are "limited to property in the actual or constructive

possession[1] of the bankruptcy court."  *Beard v. Braunstein*, 914 F.2d 434, 444 (3d Cir. 1990).

Thus, there exists a difference "between a "core" turnover proceeding and a "non-core" state-law

contract action."  *Id.*  "[A] garden variety contract claim" cannot be considered a core

proceeding.[2]  *Id.*  Such a claim can, at most, be found to be "related to" the bankruptcy.

---

[1] Constructive possession has been found to exist:
> where the property was in the physical possession of the debtor at the
> time of the filing of the petition in bankruptcy, but was not delivered by
> him to the trustee, where the property was delivered to the trustee, but
> was thereafter wrongfully withdrawn from his custody; where the
> property is in the hands of the bankrupt's agent or bailee; where the
> property is held by some other person who makes no claim to it; and
> where the property is held by one who makes a claim, but the claim is
> colorable only.

*Beard v. Braunstein*, 914 F.2d 434, 444 (3d Cir. 1990) (quoting *Taubel-Scott-Kitzmiller Co. v. Fox*, 264 U.S. 426, 432-33 (1924)).

[2] The Third Circuit reached this conclusion by citing a Second Circuit case, *In re Leigh and Hudson River Ry. Co.*, 468 F.2d 430, 433 (2d Cir. 1972), which stated:
> While a chose in action is property of the estate, and the bankruptcy

In this case, the dispute is the over the Defendant's withholding of funds allegedly

belonging to the Debtor.  However, the Defendant claims these funds rightfully belong to it

pursuant to the contract and course of dealing between the parties.  Such a proceeding can be

characterized as "nothing more than a traditional state law cause of action that exists

independently" from the Debtor's bankruptcy.  *Centennial Res., Inc. v. Coal Equity, Inc. (In re*

*Centennial Coal, Inc.)*, 278 B.R. 54, 58 (Bankr. D. Del. 2002).  It is a breach of contract claim;

therefore it is not a core proceeding.  However, it is "related to" the bankruptcy case.  The

outcome of the proceeding will affect the administration of the bankruptcy because if the Trustee

is successful in recouping the funds there will be additional funds to disburse in the bankruptcy.

Any attempt to argue the matter can be classified as core under § 157(b)(2)(A) or (O) is

unpersuasive.  Such "catch-all" provisions should not be misconstrued.  "A proceeding is not

"core" simply because it 'arguable fits within the literal wording' of one of the listed

proceedings under § 157(b)(2)."  *Centennial Coal*, 278 B.R. at 57 (quoting *In re Lacy*, 183 B.R.

890, 893 (Bankr. D. Colo. 1995)).  As already discussed above, the requisite standard for a core

proceeding has not been met here.

The court has limited jurisdiction to hear non-core proceedings.  Pursuant to 28 U.S.C. §

157(c)(1), the court shall "submit proposed findings of fact and conclusions of law to the district

court, and any final order or judgment shall be entered by the district judge after considering the

bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters

to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1) (2000).

---

court can determine who owns it, "the bankruptcy court does not have
summary jurisdiction to enforce a chose in action against the bankrupt's
obligor, even when the bankrupt's rights seem, clear."
*Beard*, 914 F.2d at 444 (quoting *Leigh & Hudson River Ry. Co.*, 468 F.2d at 433).

However, with the consent of all parties, a bankruptcy court may issue final judgments subject to

appeal to the district court. *Id.* § 157(c)(2). The Defendants, who opposed the classification of

the proceeding as core, consented in their answer to allowing this court to enter final judgment.

The Trustee's argument that this is a core proceeding can be interpreted as the Trustee

consenting to this court's entering final judgment. Thus, although this is a non-core proceeding,

the parties have all consented to this court entering final judgment.

## FINDINGS OF FACT AND PROCEDURAL HISTORY

Omne Staffing, Inc., the debtor in this case, was engaged in the  business of retaining

employees for its clients. Professional employer organizations ("PEOs") provide clients with

efficient and cost-effective ways to outsource the management of basic departments, such as

payroll and human resources. *See* National Association of Professional Employer Organizations,

"What is a PEO?", http://www.napeo.org/peoindustry/definition.cfm (last visited Jan. 15, 2008).

Thus, a PEO acts as an employer directly employing the workers for various companies and

providing administrative services, payroll processing, and insurance coverage for the workers,

such as worker's compensation.

**I.      CONTRACT**

Omne entered into a business arrangement with Affiliated Employment Services

("AES"), a Florida corporation and the Defendant in this matter, in July 2002. Defendant,

Russell B. Reaves, is the principal of AES. AES agreed to act as an intermediary, locating

clients for Omne. AES also agreed to perform certain administrative functions for the clients on

behalf of Omne. In turn, Omne would provide PEO services to the businesses AES located and

5

pay AES a commission[3] for its services.  For clients procured by AES, AES processed the

client's payroll by imputing data into Omne's computer, printing payroll checks drawn on

Omne's account, delivering checks to the client together with Omne's invoice, and collecting the

gross amount of the payroll plus fees from the client.  A written document signed by Omne and

AES (referred to as "Exhibit A") contained the following provision: "AES will collect [client]

payments with all checks deposited at the local branch office of Bank of America Account #

003446924514 [an Omne bank account].  Copies of checks and deposit slips to be forwarded to

Omne on a weekly basis."  However, that practice was not followed in all cases.  As described in

more detail below, some clients paid AES who deposited the funds into its own bank account.

## II.    COURSE OF DEALING

AES commenced performance in July 2002.  First, AES began by soliciting clients on

behalf of Omne.  Each such client was submitted to Omne for approval by email and by fax.

After approval, Omne would open a file for the client on its computer at its New Jersey home

office and set up the client with all the rates approved by Omne.  Once the file was open and set

up, AES would enter the client's employee information so that AES could enter payroll time data

on behalf of Omne.  In order to do this, AES had remote access to the computer maintained by

Omne at its corporate office in New Jersey.

The next step was for the client to turn in payroll time to AES's office by email, fax, or

phone.  AES would then input this information into Omne's New Jersey computer, utilizing

Omne's terminal services.  AES would follow up by scanning or faxing a copy of the payroll

---

[3] The term "commission", though used by both parties to describe AES's compensation, is really a misnomer.  "Mark up" is more descriptive.  Omne gave AES a schedule of prices for its PEO services.  AES would sell those PEO services for more than Omne's price schedule.  The difference, or mark up, was AES's revenue.

time sheets to Omne for approval.  Omne would then approve the input and release the batch of

checks for processing by AES.  After the checks were printed, AES would print invoices for the

client and package the checks, a turn around time sheet for future time, and an invoice for the

client.  Checks were printed on stock purchased by AES but were drafted on Omne's Bank of

America account.  The invoices specified that payment was to be made by the client to Omne,

but this is not how all payments were handled.  These packages were sent to clients by AES.

On a daily basis, AES received payment from clients.  Some clients did not make

payment to Omne (as specified on the invoice).  Rather, some clients made payment to AES who

deposited the funds into its general bank account.  Approximately 30 percent of the client funds

went into AES's bank account.  There is no evidence that Omne ever objected to this.  Not until

April 2003, when the relationship soured, did Omne notify all clients to pay it directly.

AES prepared reports showing the commissions due it from Omne and sent invoices for

commission, together with copies of the commission reports, to Omne weekly.  Exhibit A called

for commissions to be paid by Omne to AES biweekly.  Once again the practice used by the

parties did not correspond to the signed documents.  Omne made payments to AES sporadically,

and the amounts paid never corresponded to the amounts in AES's invoices.

## III.    CLIENT W FUNDS

One of the clients located by AES was Client W.[4]  It had the largest payroll of any of the

clients that paid AES, as opposed to Omne.  In September 2002, AES began receiving payments

from Client W as well as some other clients.  AES did not immediately remit these client funds

to Omne.  Between September 23, 2002 and January 9, 2003, AES received eight biweekly

[4] For the purpose of this litigation, it is not necessary to refer to this client by name.
Instead, the client will be known as "Client W".

payments from Client W totaling approximately $3.5 million, and, in time, AES made eight

payments in the exact same amounts to Omne.  However, the delay in remittance varied from the

shortest time of seventeen days to the longest of sixty-two days with the mean and average both

being thirty days.  Also, during this time span AES never remitted a payment to Omne until it

had collected at least two, and sometimes three, payments from Client W.  The amount of

delayed funds always exceeded the commissions due from Omne.

AES asserts that it did not immediately remit Client W's funds to Omne because AES

was using those funds to pay its expenses such as rent, payroll, and commissions to sales

representatives.  A comparison of AES's bank records with its accounts payable ledger for Omne

bears this out.  The amount due to Omne always exceeded the amount in AES's bank account at

the end of each month from September to December 2002.  AES's use of client funds to pay its

operating expenses is also consistent with AES's pattern of withholding remittance of one

payment until it had received two or three more from Client W.

## IV.    AES'S COMMISSION

AES introduced into evidence its accounts receivable ledger with Omne showing the

billing and payment history between them.  AES invoiced Omne frequently for the commissions

due for AES's services.  Omne's payments did not follow any temporal pattern and the court was

unable to match the amount of any payment from Omne to the amount of any particular invoice

or group of invoices from AES.  The balance of commissions receivable grew in the first month

of September 2002 to approximately $300,000 and stayed in that range, plus or minus 20

percent, though December 2002.

In 2003, the balance due from Omne increased dramatically, as Omne's payments

occurred less frequently, so that by the end of March 2003 Omne owed AES approximately

8

$800,000. At the same time in 2003, AES began remitting payments to Omne more quickly as

clients paid AES except for Client W. In March and April 2003, AES collected $1,074,885.99

from Client W and remitted only $301,000 to Omne. By the second quarter of 2003 the

relationship deteriorated. In April 2003, Omne contacted the clients and directed them to make

all payments to Omne, not AES. On or about July 26, 2003, Omne stopped honoring AES's

client approval and denied AES access to its computers, which prevented AES from servicing its

clients. Omne refused to pay AES any commissions. The last payment from AES to Omne was

on July 1, 2003, in the amount of $175,000. AES owed Omne approximately $773,000 on

account of Client W funds. According to Mr. Reaves, this final payment left the contra accounts

between Omne and AES about the same. In his words, they "broke even."

## V.    BANKRUPTCY

On April 9, 2004, Omne filed a voluntary petition for relief under chapter 11. On

December 31, 2004, AES made an entry on its own books to apply the withheld Client W

payments to commissions allegedly owed to it by Omne in the approximate amount of $773,000.

After that credit was issued, AES's books still reflected a balance due and payable from Omne in

the amount of $38,004.27, which was attributed to interest.

The Trustee moved for summary judgment, and the Defendants opposed the motion

claiming there were genuine issues of material fact. Subsequently, the parties agreed to submit

the matter on a stipulated evidentiary record for trial and were permitted to make additional

submissions to the court.

## DISCUSSION

## I.    SETTOFF

Section 553 provides in, relevant part:

> [T]his title does not affect any right of a creditor to offset a
> mutual debt owing by such creditor to the debtor that arose before the
> commencement of the case under this title against a claim of such
> creditor against the debtor that arose before the commencement of the
> case . . . .

11 U.S.C. § 553 (Supp. 2005).  This section preserves the right to setoff, which " 'allows entities

that owe each other money to apply their mutual debts against each other, thereby avoiding the

absurdity of making A pay B when B owes A.' "  *In re Anes*, 195 F.3d 177, 182 (3d Cir. 1999)

(citing *Citizens Bank v. Strumpf*, 516 U.S. 16, 18 (1995)).[5]

For the right to setoff to apply, the following elements must be met: "(1) the creditor

holds a claim against the debtor that arose before the commencement of the case; (2) the creditor

owes a debt to the debtor that also arose before the commencement of the case; (3) the claim and

debt are mutual, and (4) the claim and debt are each valid and enforceable."  *In re Stienes*, 285

B.R. 360, 362 (Bankr. D.N.J. 2002).

In this case, AES has a claim against Omne for unpaid commissions of approximately

$800,000 that arose prior to the commencement of the case.  Thus, Omne owed this debt to AES

prior to its April 2004 bankruptcy filing.  Neither the validity nor the enforceability of the claim

or debt has been challenged in this case.  Likewise, AES admits that it owes Omne for client

funds collected prepetition in the approximate amount of $773,000.  Therefore, the only issue

that remains is whether the debts satisfy the mutuality requirement.[6]

---

[5] The right to setoff is not absolute and is limited by the automatic stay.  *In re Stienes*,
285 B.R. 360, 362 (Bankr. D.N.J. 2002).  A creditor must move for relief from the stay in order
to assert this right.  *Id.*  Relief from stay is not an issue at this point in the litigation because AES
maintains a valid claim against Omne regardless of whether it moved for relief.

[6] It is relevant to note that the right to setoff has traditionally been viewed as "permissive
and can be modified through the exercise of the equitable powers of the court."  *Stienes*, 285
B.R. at 363.  Denial of setoff is appropriate "where the creditor acted inequitably; where the
setoff would jeopardize the debtor's ability to reorganize; or in a liquidation context where the

The existence of mutuality is crucial in determinating whether setoff is permissible.  The

term "mutual debt" is not defined in the Bankruptcy Code.  *In re Art Metal U.S.A., Inc.*, 109 B.R.

74, 78 (Bankr. D.N.J. 1989).  The term's meaning has been strictly construed by courts and

interpreted "to require that the debts be in the same right and between the same parties, standing

in the same capacity."  *Id.*  Therefore, the basic test is whether something is owed by each side –

meaning "[t]he creditor's debt must be owed to the estate of the debtor and the estate's debt must

be owed to the creditor."  *Id.*  Mere similarity of obligations is insufficient.  *Id.*

The key to the analysis is to determine whether the parties were in a creditor-debtor

relationship or whether AES held the client fund in a fiduciary capacity.  The right to setoff will

be preserved if a creditor-debtor relationship existed because the parties will be considered to

have been in the same capacity.  If a fiduciary relationship exists, the right to setoff is generally

disallowed.  *See In re Tarbuck*, 304 B.R. 718, 721 (Bankr. W.D. Pa. 2004).[7]  *See also Libby v.*

---

setoff would result in either a preference or priority over other unsecured creditors."  *Id.* at 363
(quoting *In re Lykes Bros. S.S. Co., Inc.*, 217 B.R. 304, 313 (Bankr. M.D. Fla. 1997)).  Such
factors are not at issue there.  Thus, there is no equitable basis for denying the right to setoff.

[7] There are certain limited circumstances when the existence of a fiduciary relationship
will not bar the right to setoff:

> The fact that one of the parties has a fiduciary duty in some
> context, however, does not necessarily preclude mutuality. *In re Fox
> Bean Co., Inc.*, 287 B.R. 270, 287 (Bankr. D. Idaho 2002) (citing 5
> COLLIER ON BANKRUPTCY ¶¶ 553.03[3][b] and 553.03[3][c][ii] ("the
> existence of a fiduciary relationship need not prevent mutuality")). A
> distinction must be drawn between different types of fiduciary
> relationships. "First, mutuality may be found if setoff would not violate
> the fiduciary obligation in question, as in the case of certain types of
> security deposits. Second, mutuality may exist if the party asserting the
> right of setoff is not the one acting as a fiduciary. Third, the rule does not
> prevent setoff if the obligations sought to be offset between the parties
> are unrelated to either party's fiduciary responsibilities." 5 COLLIER ON
> BANKRUPTCY ¶¶ 553.03[3][c][i] (footnotes omitted); *Allegaert v. Perot*,
> 466 F.Supp. 516, 519 (S.D.N.Y.1978).

*In re Garden Ridge Corp.*, 338 B.R. 627, 642 (Bankr. D. Del. 2006).  The rationale behind these
exceptions is that "[i]f the asserted right of setoff would not violate any special trust between the

*Hopkins*, 104 U.S. 303, 309 (1881) (finding that funds held in trust may not be set off against

another claim). "The logic of this rule is that the trust res is not owing to the bankrupt's estate,

but rather is owned by it." *Cohen v. Sav. Bldg. & Loan Co. (In re Bevill, Bresler & Schulman*

*Asset Mgmt. Corp.)*, 896 F.2d 54, 57 (3d Cir. 1990).  "The virtually unanimous rule is that

creditor-debtor relationships rarely give rise to a fiduciary duty." *United Jersey Bank v. Kensey*,

704 A.2d 38, 44 (N.J. App. Div. 1997).

     Under New Jersey law,[8] a fiduciary relationship exists when "one party places trust and

confidence in another who is in a dominant or superior position." *F.G. v. MacDonell*, 696 A.2d

697, 703-04 (N.J. 1997).  Such a relationship arises when one party "is under a duty to act or

give advice for the benefit of another on matters within the scope of their relationship." *Id.* at

704.  Determining whether such a relationship existed is a factually driven analysis. *Id.*[9]

     In *United Jersey Bank v. Kensey*, the New Jersey Appellate Division, in discussing the

duty to disclose, outlined three instances that could give rise to a fiduciary duty. The first arises

when a traditional fiduciary relationship exists, such as principal and agent or attorney and

---

parties, then setoff should be permitted notwithstanding that the claim or debt is of a fiduciary
character, provided that the setoff would be permissible under applicable nonbankruptcy law and
the other requirements of section 553 have been satisfied." 5 COLLIER ON BANKRUPTCY ¶¶
553.03[3][c][ii] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2007).  These exceptions to
the general rule that a fiduciary relationship bars the establishment of mutuality are not
applicable in the present case.

    [8] While AES is a Florida corporation, both parties have argued their positions based on
New Jersey law.  The court assumes the parties consensus that New Jersey law applies is correct.

    [9] "But to say that a man is a fiduciary only begins analysis; it gives direction to further
inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what
respect has he failed to discharge these obligations? And what are the consequences of his
deviation from duty?" *SEC v. Chenery Corp.*, 318 U.S. 80, 86 (1943).

client. *Id.* at 44. Second, when "'either one or each of the parties, in entering . . . [the] transaction, expressly reposes . . . a trust and confidence in the other . . . or [because of the] circumstances of the case, the nature of the dealings, or their position towards each other, such a trust and confidence . . . is necessarily implied.'" *Id.* (quoting *Berman v. Gurwicz*, 458 A.2d 1311, 1313-14 (N.J. Ch. Div. 1981)). "The third includes contracts or transaction which in their essential nature, are 'intrinsically fiduciary,' and 'necessarily call[] for perfect good faith and full disclosure, without regard to any particular intention of the parties.'" *Id.* (quoting *Berman*, 458 A.3d at 1314)).

In *Bohlinger v. Ward & Co.*, 113 A.2d 38 (N.J. App. Div. 1955), the New Jersey Appellate Division disallowed setoff where an insurance agent attempted to setoff unpaid commissions against his indebtedness to the plaintiff insurance company for premiums he had collected from insureds. *Id.* at 43. The court found a fiduciary relationship existed between the agent and company, rejecting the notion that the parties were in a creditor-debtor relationship. *Id.* at 40-43. The court placed great emphasis on the finding that the agent abused the relationship by using confidential information related to the dire financial situation of the company to his own advantage. *Id.* at 41-43. The court stated: "It is familiar law that a fiduciary cannot assert as an offset a personal claim against a beneficiary who seeks payment from the fiduciary of funds held for the beneficiary, nor may a trustee withhold trust funds from a cestui to obtain payment of a personal debt." *Id.* at 43.

In *Commercial Insurance Co. v. Apgar*, 267 A.2d 559 (N.J. Law Div. 1970), the New Jersey Law Division explained "that courts are not hesitant in positing a trust with respect to premiums received by an agent on behalf of an insurer, if one or more factors are present." *Id.* at 564. Such factors include a written agreement, an operative statute, and policy considerations.

*Id.*  Courts will also consider the course of dealing between the parties in order to determine the

actual nature of the relationship.  *Id.*  The court found the evidence in *Apgar* did not support the

finding of a trust because no expressed contract existed, no applicable statue governed, and there

was no course of dealing establishing such a relationship.  *Id.* at 564-65.  The court indicating

that it might have come to a different conclusion if there was evidence that funds for the plaintiff

were specifically segregated or earmarked.  *Id.*

Here, the Trustee argues no right to setoff exists because mutuality cannot be established

since AES held the money received from Client W in a fiduciary capacity.  AES disagrees,

arguing no fiduciary relationship existed because the course of dealing between the parties did

not establish a trust relationship.

The documents that the parties signed that purported to be a written contract are

confusing, to say the least, and inappropriate for the relationship intended.  For example, a

document dated July 23, 2002, supposedly states that "terms and conditions of the new branch

operation as between Omne Staff Leasing, Inc. (Omne) and Affiliated Employee Services

(AES)".  However, the balance of the eight-page document is Omne's standard form client

contract.  This form did not reflect the actual agreement reached by the parties whereby AES

would solicit clients for Omne's PEO business and perform payroll processing services for

clients on behalf of Omne.  In fact, the Trustee asserted that this July 23, 2002 document "does

not encompass" the agreement of the parties.

A second document styled "Exhibit A" was signed by Omne's president on August 12,

2002.  That provides that "Omne will supply AES necessary computer software and hardware to

become a branch operation of Omne."  A "branch" is defined as "a division of an organization"

or "a separate but dependent part of a central organization".  MERRIAM-WEBSTER'S COLLEGIATE

DICTIONARY 138 (10th ed. 1999).  This document, while coming closer to portraying the

agreement of the parties, is also inaccurate because AES always remained a separate,

independent corporation.  It never became a branch of Omne.

A third document styled "Addendum 1" and signed by AES's representative on

September 19, 2002, refers to the "new branch operations contract duly executed by Affiliated

Employee Services, Inc. (AES) and Omne Staff Leasing, Inc. (Omne) on August 12, 2002".

However, this Addendum 1 was never signed by Omne and cannot be taken as the binding

agreement between the parties.

Reviewing these three documents leads to the conclusion that Omne and AES never

accurately embodied their agreement in any writing.  Therefore, the documents may be

disregarded and the real agreement of the parties can best be gleaned from their course of

dealing.

The course of dealing shows that some clients wired money directly into Omne's bank

account and some issued checks to Omne that were deposited into Omne's bank account, but

approximately 30 percent of the client funds were paid to AES and deposited in its bank account.

While AES acknowledges a responsibility to remit the client funds to Omne, it delayed remitting

the funds because: (a) Omne was slow in paying commissions and (b) AES needed cash to pay

its bills.  Omne apparently acquiesced in this practice.   Mr. Reaves's testimony is that Omne

never complained about client funds going into AES's account, the delay in remitting those

funds, or AES's use of client funds to pay its expenses.  No evidence was presented that Omne

ever objected to this practice or pressed for payment of client funds.  To the contrary, the

evidence showed that AES frequently demanded that Omne pay commissions timely, but its

entreaties were not heeded.

When Omne abruptly terminated AES in July 2003, AES was holding approximately

$773,000 in client funds. One would have expected Omne to have pressed for collection, if not

sued, for those funds. But, since Omne owed AES more than $800,000 in commission, it is not

surprising that Omne did not pursue the client funds. Likewise, no evidence was produced

showing any collection activity by AES following termination by Omne in July 2003. Although

AES frequently demanded payment of commissions while it was working for Omne, once the

relationship ended, the payment demands ceased. The explanation seems obvious. Both parties

recognized their countervailing claims were roughly equal and there was no net gain to be

achieved by pressing them. The course of dealing and the inactivity following termination

negate the idea that AES held the client funds in a fiduciary capacity. Rather, the parties treated

their obligations as mutual and were content because of equality. As Mr. Reaves testified, they

"broke even."

This case is analogous to *Bevill, Bresler*, in which the Third Circuit reversed the

determination of the district court that a contractual agreement obligating one party to turn over

treasury bonds was a fiduciary obligation and not a debt. 896 F.2d at 59. In that case, the debtor

and Savings Building & Loan Co. entered into a repurchase agreement under which the debtor

sold Savings treasury bonds and agreed to repurchase those bonds at a later date. *Id.* at 55-56.

On the repurchase date, the debtor delivered the agreed upon amount for repayment, but Savings

never delivered the treasury bonds. *Id.* at 56. The court "conclude[d] that Savings owed a debt

to [the debtor] to the extent that it failed to deliver the Treasury Bonds, or their equivalent, as

required by the contract." *Id.* at 59. The court found that "[i]t is clear that contractual

obligations are debts for purposes of setoff." *Id.*

Here, AES received funds and used those funds with the acquiescence of Omne. Thus,

AES's obligation became that of a debtor.  AES had an obligation to Omne; however, that

obligation was not to turn over particular property but to pay Omne an amount of money.  As the

Third Circuit made clear in *Bevill, Bresler*, this should clearly be characterized as a debt.

As in the *Apgar* case, no express contact or statute established a trust relationship and

AES never segregated client funds, but deposited them in its general operating account and used

them for nearly a year to pay expenses.  These facts support the conclusion that AES did not

hold client funds in a fiduciary capacity despite being in a business relationship with Omne in

which it was obligated to remit funds.  AES treated the funds received from Client W as its own,

and the obligation to remit funds to Omne as a debt.  Therefore, the element of mutuality is

satisfied because AES and Omne both owed each other a debt – AES owed Omne the funds it

received from Client W, and Omne owed AES a commission for its services.

Since all of the elements have been satisfied, AES was entitled to exercise its right to

setoff to the extent it was owed back commissions from Omne.[10]

## II.    RECOUPMENT

Even if a fiduciary relationship existed between Omne and AES, AES is entitled to the

funds based on the doctrine of recoupment.

Recoupment exists as an equitable remedy. *See In re Anes*, 195 F.3d 177, 182 (3d Cir.

---

[10]  The Trustee argues, in the alternative, that the retention of the funds by AES was an
illegal conversion in violation of AES's fiduciary duties.  "To constitute an act of conversion,
'[i]t is sufficient if the owner has been deprived of his property by the act of another assuming an
unauthorized dominion and control over it.' " *Charles Bloom & Co. v. Echo Jewelers*, 652 A.2d
1238, 1242 (N.J. App. Div. 1995) (quoting *McGlynn v. Schultz*, 218 A.2d 408, 420 (N.J. App.
Div. 1966)).  Since this court has determined that AES did not receive Client W's funds in a
fiduciary capacity, no conversion could have taken place.  Therefore, it is not necessary to
address this argument.

1999). "Recoupment permits a creditor that owes a debt to the debtor to reduce the amount of its debt by the amount of a debt owed by the debtor to the creditor . . . [but] exists only where the two debts arise out of the same transaction." *Id.* The rationale being that "where the creditor's claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the limitations of setoff in bankruptcy would be inequitable." *Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir. 1984). Thus, a showing of mutuality is not required.

In order for recoupment to be warranted, a party must show more than a mere logical relationship between the debts. *In re Univ. Med. Ctr.*, 973 F.2d 1065, 1081 (3d Cir. 1992). "Rather, both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." *Id.*

The Third Circuit found this standard was not met in *Anes*, where the city claimed recoupment was applicable to permit pension plans to deduct loan payments from debtors' paychecks. 195 F.3d at 182. In that case, the debtor's debt arose from a loan she obtained, while the city's obligation to pay her arose from the employment arrangement. *Id.* The court found this could not be considered the "same transaction." *Id.*

The United States Bankruptcy Court for the District of Delaware found a "single integrated transaction" existed between the parties in *MBNA American Bank, N.A. v. Trans World Airlines, Inc. (In re Trans World)*, 275 B.R. 715 (Bankr. D. Del. 2002), preventing the dismissal of a claim for recoupment. In that case, MBNA and the debtor had an agreement whereby MBNA issued credit cards featuring the debtor's logo. *Id.* at 716. After the debtor filed bankruptcy, this contract was ultimately terminated by consent order. *Id.* A company that

purchased the debtor's accounts receivable, which included money due to the debtor from

MBNA, sued MBNA for payment of the receivables due. *Id.* MBNA raised the right to

recoupment as a defense. *Id.* The court ultimately held MBNA's claims, relating to "alleged

breached of the indemnification and exclusivity provisions" of its agreement with the debtor,

arose out of the same transaction as the accounts receivable. *Id.* at 721. The court found:

> Since MBNA's agreement to pay royalties to the Debtor [as part of its
> accounts receivable] was premised on MBNA being the exclusive credit
> card company to use the TWA logo and to have such an affinity
> agreement with the Debtor, we conclude that the claims of MBNA (for
> breach of the . . . [a]greement) arise from the very same transaction on
> which the account receivable is premised.

*Id.*

Here, the facts indicate the circumstances at issue were part of a "single integrated

transaction." Omne retained AES to locate clients and perform other services relating to those

clients. AES performed its obligations and earned commissions due from Omne. In the course

of performing its duties, AES received funds from clients to be remitted to Omne. Both

obligations arose out of the same contract. This is distinguishable from *Anes* because here all

relevant circumstances relate back to the same point, Omne's business, and not two independent

dealings. The facts are similar to *Trans World* because there is a close connection between the

payments received by AES from Client W and the commissions owed to AES by Omne. The

receipt of those payments from Client W was part of AES's obligation to Omne pursuant to their

business relationship; hence, the receipt and remittance of these payments relates directly to

Omne's obligation to pay AES commissions for its work. As in *Trans World*, all circumstances

relate back to the relationships and agreement between the parties. Furthermore, it would be

inequitable to allow Omne to retain all of the funds if AES were not compensated for its

services.

The Trustee argues that the obligations do not relate to the same transaction.  He posits

that Omne's right to Client W's funds arises out of the agreement between Omne and Client W,

while AES's right to commissions arises from the separate Omne-AES agreement.  This

argument overlooks the fact that from September 2002 through April 2003 Omne was content to

let AES collect payments from Client W and use those funds to operate its business.  Once Client

W paid AES its obligation to Omne was satisfied.  Thereafter, the debt to Omne became solely

that of AES and arose in the course of its acting as a sales and servicing intermediary for Omne.

Therefore, even if AES received Client W's funds in a fiduciary capacity, which prevents

the use of the right of setoff, AES has a right to recoup the funds through this equitable doctrine.

**CONCLUSION**

The right to setoff under § 553 is preserved.  Here, the course of dealing between parties

shows that AES was free to use the funds before remitting them to Omne.  Such an arrangement

negates that the funds were held in a fiduciary capacity.  Therefore, mutuality can be established

and AES can properly exercise its right to setoff.  Additionally, even if AES received Client W's

funds in a fiduciary capacity, AES would be permitted to recoup the funds because the

circumstances surrounding the funds relate to a single integrated transaction.  Thus, under either

doctrine, AES is entitled to the funds and no amount is due to the Trustee.

Dated: January 16, 2008                    **/S/Raymond T. Lyons**
                                           United States Bankruptcy Judge